TRADITIONALIST AMERICAN
KNIGHTS OF the KU KLUX
KLAN, et al., Plaintiffs,

v.

CITY OF DESLOGE, MISSOURI,
Defendant.

Case No. 4:13–CV–810 NAB.

United States District Court,
E.D. Missouri,
Eastern Division.

Oct. 1, 2013.

Grant R. Doty, Anthony E. Rothert, American Civil Liberties Union of Missouri Foundation, St. Louis, MO, for Plaintiffs.

John G. Young, Jr., Neal B. Griffin, Stinson and Morrison, St. Louis, MO, Joseph L. Goff, Sr., Reeves and Goff, P.C., Farmington, MO, for Defendant.

### MEMORANDUM AND ORDER

NANNETTE A. BAKER, United States Magistrate Judge.

This matter is before the Court on Plaintiffs Traditionalist American Knights of the Ku Klux Klan ("KKK") and KKK Imperial Wizard Frank Ancona's Motion for Preliminary Injunction. [Doc. 5.] Plaintiffs seek to enjoin Defendant City of Desloge, Missouri from enforcing an ordinance, which prohibits pedestrians from soliciting or distributing in roadways. Plaintiffs assert that the ordinance imper-

missibly infringes upon Plaintiffs' rights under the free speech clause of the First Amendment and is impermissibly vague under the due process clause of the Fourteenth Amendment. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Court will grant Plaintiffs' motion.

## I. Background

On or about June 14, 1999, the Aldermen of the City of Desloge ("City") enacted § 615.070 entitled "PROHIBITION AGAINST SOLICITATION IN STREETS" in an attempt to prohibit pedestrians from soliciting in roadways. City of Desloge, Mo. Ord. § 615.070 ("1999 Ordinance"). Section 615.070 provided: "No peddler nor any other person, association, corporation or other entity shall be authorized to conduct any solicitation activities, or to occupy, use or operate in or upon any public highway, thoroughfare or street within the City of Desloge." On December 27, 2012, the Honorable Audrey G. Fleissig for the Eastern District of Missouri preliminarily enjoined enforcement of § 615.070. *Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge*, 914 F.Supp.2d 1041 (E.D.Mo.2012).

On April 8, 2013, the City passed Ordinance 2013.04, which repealed § 615.070 and enacted § 220.205 entitled "PEDESTRIANS PROHIBITED FROM SOLICTING [*sic*] IN ROADWAYS." City of Desloge, Mo. Ord. § 220.205 (effective Apr. 8, 2013) ("April 8 Ordinance"). Section 220.205 provided: "No person shall stand in or enter upon a roadway for the purpose of soliciting rides, employment, business or charitable contributions from, or distribute anything to, the occupant of any vehicle, except from the occupants of motor vehicles parked off the traveled portion of a roadway adjacent to a sidewalk if the solicitor is on a sidewalk."

On April 26, 2013, Mr. Ancona and several other members of the KKK attempted to distribute handbills at Oak Street and Desloge Drive, a four-way stop in the City of Desloge. The "main" handbill distributed that day described the KKK's views on gun rights. The organization also distributes handbills on topics like pedophilia and drugs and some members have worn traditional KKK regalia while distributing literature in the roadways of Desloge. Mr. Ancona testified that members stood on the sidewalk holding up the handbills and, if the occupant of a stopped vehicle signaled he wanted one, a member would step out into the street to hand it to him. Police Corporal Sean Roney was coming up on the intersection of Oak and Desloge when he saw a member do just that. Recognizing Mr. Ancona, Corporal Roney approached him, informed him of the new ordinance, and said he had observed a violation. Mr. Ancona then voluntarily accompanied Corporal Roney to City Hall where he was given a copy of § 220.205. At the direction of his police chief, Corporal Roney told Mr. Ancona he had to comply with the ordinance. After scanning the ordinance, Mr. Ancona instructed his members to leave. Mr. Ancona testified that he was told all ordinances on the books would be enforced, that he believed this ordinance to be on the books, and that he therefore feared arrest and prosecution if the KKK continued to distribute handbills. City officials have had no further contact with the KKK.

On April 29, 2013, Plaintiffs filed this action against the City seeking to enjoin enforcement of § 220.205.

On August 12, 2013, the City passed Ordinance 2013.09 amending § 220.205, now entitled "PEDESTRIANS PROHIBITED FROM SOLICITING OR DISTRIBUTING IN ROADWAYS." City of Desloge, Mo. Ord. § 220.205 (effective

Aug. 22, 2013) ("August 12 Ordinance" or simply "Ordinance" or " § 220.205"). As amended, § 220.205 provides:

1. No person shall stand in or enter upon a Roadway for the purpose of:

(i) soliciting rides from the occupant of any vehicle;

(ii) soliciting employment from the occupant of any vehicle;

(iii) soliciting business or sales of anything from the occupant of any vehicle; or

(iv) soliciting charitable contributions from the occupant of any vehicle.

2. No person shall stand in or enter upon a Roadway for the purpose of distributing anything to the occupant of any vehicle.

3. The Solicitation described in subparagraph 1 and the Distribution described in subparagraph 2, are each permissible to an occupant of a non-moving vehicle on the Roadway adjacent to the sidewalk and if the person doing so is on the adjacent sidewalk.

4. Nothing contained herein is intended to prohibit Solicitation or Distribution by any person on a sidewalk, to another person on the sidewalk, or by and among persons in a city parking lot or city park.

Terms are defined as follows:

"ROADWAY": "[t]he portion of a public street, road, or highway improved, designed, or ordinarily used for vehicular travel and extending from one (1) curb or edge of pavement to the opposite curb or edge of pavement, including lanes commonly used for parking and including center medians and lane dividers."

"SIDEWALK": "[t]hat portion of a public right-of-way between the curb lines or the lateral lines of the pavement on the Roadway and the adjacent property lines, intended for use by pedestrians."

"Solicitation": "an exchange between the person within the Roadway and an occupant of a vehicle on the Roadway that often requires the passing or exchange of money and/or other items." "Distribution": "an exchange between the person in the Roadway and an occupant of a vehicle on the roadway, which requires an acceptance or rejection of the item being distributed."

City of Desloge, Mo. Ord. § 220.205 (effective Aug. 22, 2013).

On August 21, 2013, Plaintiffs filed an Amended Complaint. On August 22, 2013, the Ordinance went into effect. Violation can result in a fine not to exceed $500.00, imprisonment not to exceed ninety (90) days, or both. City of Desloge, Mo. Ord. 2001.06 § 5(a) (effective March 12, 2001). Mr. Ancona testified that he has read a copy of the Ordinance provided to him by counsel and assumes if KKK members return to Desloge and step into the street to distribute handbills, they will be in violation of the Ordinance. He testified that it would be difficult to distribute literature at the intersection of Oak and Desloge without stepping off the sidewalk and that the KKK prefers to distribute at that intersection because it provides the most visibility and efficiency.

The Court held a hearing on the matter on September 11, 2013. The City agreed to an abeyance until the issuing of this Order. The City also agreed not to arrest or prosecute Mr. Ancona or any other member of the KKK for their April 26 distribution activity and Plaintiffs in turn dropped their challenge to the April 8 Ordinance. The only ordinance now under review is the August 12 Ordinance.

## II. Standard of Review

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the

movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981). "It is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Phelps–Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir.2008) (internal quotations omitted), *overruled on other grounds by Phelps–Roper v. City of Manchester,* 697 F.3d 678 (8th Cir.2012). Thus, if Plaintiffs can establish a sufficient likelihood of success on the merits of their First Amendment claim, they will also have established irreparable harm. *See id.* "Likewise, the determination of where the public interest lies also is dependent on the determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to protect constitutional rights." *Id.* "The balance of equities, too, generally favors the constitutionally-protected freedom of expression. In a First Amendment case, therefore, the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Id.*

## III. Discussion

As a threshold matter, the Court must determine whether Plaintiffs having standing to challenge the Ordinance and whether, as the City has argued, their challenge is limited to those provisions of the Ordinance which govern distribution ("Distribution Provisions").

### A. Standing

■■■■ To establish standing, Plaintiffs must show injury in fact, causation, and redressibility. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). An injury in fact is a concrete and particularized invasion of a legally protected interest, which is actual or imminent, not conjectural or hypothetical. *Id.* It must be fairly traceable to the challenged conduct and capable of redress by a favorable decision. *Id.* at 560–61, 112 S.Ct. 2130. Plaintiffs can show an injury in fact by showing that their First Amendment rights have been chilled due to the threat of prosecution. *See Missouri Roundtable for Life v. Carnahan,* 676 F.3d 665, 673 (8th Cir.2012). A party need not actually expose himself to arrest or prosecution, but his injury must be more than imaginary or speculative. *Id.* at 672. Self-censorship based on mere allegations of a subjective chill is not enough. *281 Care Comm. v. Arneson,* 638 F.3d 621, 627 (8th Cir.2011). "The relevant inquiry is whether a person's decision to chill his speech in light of the challenged statute was objectively reasonable. Reasonable chill exists when a plaintiff shows an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the statute, and there exists a credible threat of prosecution." *Id.* (citations and internal quotations omitted).

■■■■ Plaintiffs have shown a sufficient injury in fact. Although they have not renewed their exposure to arrest or prosecution since the August 12 Ordinance went into effect, they have shown that the decision to chill their speech by refraining from distribution is objectively reasonable. *See City of Manchester,* 697 F.3d at 687 (affirming district court's conclusion that chilling was objectively reasonable even though Plaintiffs had not tested the most recent version of the ordinance). Just as Plaintiffs have demonstrated a persistent intent to distribute literature at intersections in Desloge, the City has demonstrated an equally persistent intent to ban such

distribution. Under the current Ordinance, Plaintiffs face up to 90 days in jail for engaging in their preferred method of disseminating their message. Plaintiffs' reasonable chill is traceable to the Ordinance and would be redressed if this Court found in their favor.

The more pressing issue is whether Plaintiffs' challenge is limited to the Distribution Provisions. The Ordinance contains a severability clause: "In the event that any section, sentence clause, phrase or portion of this Ordinance is held to be invalid by a court of competent jurisdiction, the remainder of the Ordinance shall continue in full force and effect, to the extent the remainder can be given effect without the invalid portion." City of Desloge, Mo. Ord. § 220.205 § 2 (effective Aug. 22, 2013). The City argues that this clause bars Plaintiffs from challenging the Ordinance in its entirety.

■ "The Supreme Court has incorporated severability analysis into standing determinations when there was clear evidence of legislative intent.... Moreover, severance of particular statutory provisions to limit standing promotes important goals, notably the avoidance of unnecessary constitutional adjudication and the sharpening of legal issues facing the court." *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir.2006) (citations omitted). In the context of the overbreadth challenge in *Advantage Media*, the Eighth Circuit found, "Because the code's provisions are properly severable, Advantage must show injury, causation, and redressability with respect to each provision it challenges." *Id.* As long as there is clear legislative intent to promote severability and the provisions at issue are properly severable, standing—even for an overbreadth challenge—must

be evaluated as to each provision separately. *See id.* at 800–01 (emphasizing the city and state's clear intent to promote severability and the ease with which the provisions could be severed).

■ The City has demonstrated a clear intent to promote severability and the Distribution Provisions of the Ordinance are properly severable. The Ordinance's severability clause is precisely the kind of "comprehensive severability provision" analyzed in *Advantage Media*, 456 F.3d at 800. The City's Adopting Ordinance also contains a preference for severability. City of Desloge, Mo. Ord.2001.06 § 9 (effective March 12, 2001). Subparagraphs 1 and 2 of § 220.205, which ban solicitation and distribution respectively, can each stand alone. They make no reference to one another and other localities have properly enacted ordinances that address solicitation but not distribution. *See, e.g., St. Louis County*, 930 F.2d 591 (approving solicitation-only ban). Likewise, references to solicitation or distribution in subparagraphs 3 and 4 can be excised without disturbing the overall framework of the Ordinance. Because Plaintiffs have never alleged any solicitation activities, actual or potential, they do not have standing to challenge the Ordinance in its entirety and are limited in their challenge to the Distribution Provisions.[1]

The Court finds that Plaintiffs do not have standing to challenge the Ordinance in its entirety. The Court is satisfied, however, that Plaintiffs have standing to raise First Amendment and Fourteenth Amendment claims challenging the Distribution Provisions of the Ordinance.

## B. First Amendment

■ Plaintiffs engaged in protected speech in a public forum when they at-

---

1. Plaintiffs may also challenge provisions that provide the basic definitional structure and discuss the purpose and intent of the regulation. *See Neighborhood Enterprises, Inc. v. City of St. Louis*, 644 F.3d 728 (8th Cir.2011).

tempted to distribute handbills containing the KKK's views on gun rights at an intersection in the City of Desloge. The distribution of literature on a matter of public concern, especially by an unpopular speaker, is core political speech entitled to the utmost protection under the First Amendment. *See McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346–47, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (no form of speech entitled to greater constitutional protection than "handing out leaflets in the advocacy of a politically controversial viewpoint"). Moreover, courts have consistently held that public streets are a traditional public forum. *See Snyder v. Phelps,* —— U.S. ——, 131 S.Ct. 1207, 1218, 179 L.Ed.2d 172 (2011) (Supreme Court has "repeatedly referred to public streets as the archetype of a traditional public forum, noting that time out of mind public streets and sidewalks have been used for public assembly and debate") (internal quotations omitted). Plaintiffs' attempt to distribute gun rights literature in the streets of Desloge is precisely the kind of speech in precisely the kind of place that the First Amendment aims to protect most.

■■■ Notwithstanding this protection, the Distribution Provisions of the Ordinance are content neutral and thus face intermediate scrutiny. "The level of scrutiny we apply to the regulation of speech in traditional public fora is determined by whether the regulation is content based or content neutral." *Phelps–Roper v. Koster,* 713 F.3d 942, 950 (8th Cir.2013). "In determining whether a statute is content based or content neutral, the plain meaning of the text controls, and the legislature's specific motivation for passing a law

is not relevant, so long as the provision is neutral on its face." *Id.* (internal quotations omitted). A regulation that "makes no reference to the content of the speech" but merely regulates "the places where some speech may occur" is content neutral. *City of Manchester,* 697 F.3d at 689 (internal quotations omitted); *accord Koster,* 713 F.3d at 950. Here, the Ordinance regulates persons entering the roadways "for the purpose of distributing anything to the occupant of any vehicle." It bans *all* distribution in a particular place, the roadways, without regard to the content being distributed. The Distribution Provisions are content neutral. *Cf. Johnson,* 729 F.3d at 1099 (content neutrality of complete ban on distribution was only in dispute because fair organizers permitted some speakers to distribute literature from booths).[2]

■■■ As a content neutral time, place, and manner regulation, the Distribution Provisions in § 220.205 "are tested under intermediate scrutiny, which questions whether the regulations are narrowly tailored to serve a significant government interest and allow for ample alternative channels for communication." *Koster,* 713 F.3d at 950 (internal quotations omitted). The burden remains on the City to show that the Ordinance does not impermissibly infringe on Plaintiffs' protected speech. *See id.* at 949. Plaintiffs do not dispute that the City has a significant governmental interest in pedestrian and traffic safety. [Doc. 28 p. 6.]

■■■ At the heart of the parties' dispute over a preliminary injunction is the narrow tailoring requirement. On the

---

**2.** Plaintiffs argue that the City's reliance on the Eighth Circuit's decision in *ACORN v. St. Louis County* and the *Clark* test is misplaced and that the Court should apply the second prong of the *Turner* test to find the Ordinance is content based. [Doc. 28 p. 3–4.] Because

Plaintiffs' challenge is limited to the Distribution Provisions, which do not require that officials evaluate what a distributor "says," the Court need not resolve the parties' dispute regarding the content neutrality analysis in *St. Louis County.*

same day this Court held a hearing to determine whether § 220.205 should be preliminarily enjoined, the Eighth Circuit decided *Johnson v. Minneapolis Park and Recreation Board*, 729 F.3d 1094 (8th Cir. 2013). Reversing the district court's denial of a preliminary injunction, the Eighth Circuit held that a near-total ban on distribution at a public fair was not narrowly tailored to achieve crowd control. *Id.* at 1099–1100. Plaintiffs contend that, as in *Johnson*, the City's total ban on distribution in roadways is not narrowly tailored to achieve pedestrian and traffic safety. They argue *Johnson* is controlling and that courts have consistently viewed distribution as less disruptive than solicitation. By contrast, the City argues that *Johnson* is factually distinguishable, that distribution in roadways poses a similar risk, and that the Court is bound by *ACORN v. St. Louis County*, 930 F.2d 591 (8th Cir.1991), which upheld a ban on solicitation in roadways. The City contends that the Ordinance is entitled to deference because the City aims to protect public safety and consulted an expert who recommended this course of regulation. The Court will address the nature of the City's governmental interest and whether the Ordinance is narrowly tailored in turn. Despite the City's strong interest in promoting pedestrian and traffic safety, the Court finds that the Distribution Provisions of the Ordinance are not narrowly tailored.

### i. Governmental Interest

The City has repeatedly emphasized the strength of its interest in pedestrian and traffic safety. According to City Administrator Greg Camp's testimony, the City has been concerned about pedestrian safety and the risks of pedestrian activity in roadways for some time. The City enacted the 1999 Ordinance out of a concern that pedestrians might be hit, especially children soliciting donations for their sports teams. That ordinance was prelimi-

narily enjoined. *City of Desloge*, 914 F.Supp.2d 1041. When Plaintiffs challenged the City's next effort to regulate the same subject, the April 8 Ordinance, the City commissioned traffic engineer David Brammeier to examine the safety of solicitation and distribution in the roadways of Desloge. Mr. Brammeier produced a report recommending that the City ban all such activity because of the threat to pedestrian and traffic safety. [Doc. 25–3 & 4.] The City passed the August 12 Ordinance based on that recommendation.

The preamble to the August 12 Ordinance cites the City's concern with public safety and, more specifically, the threat of driver distraction. "The presence of persons within the Roadways for [solicitation and distribution] presents a risk of the person being a distraction to operators of vehicles which could result in the person in the Roadway being struck by the vehicle during its operation, or the vehicle striking another vehicle or property in an effort to avoid the person in the Roadway. Such an incident could result in serious bodily injury or death, and/or property damage." City of Desloge, Mo. Ord. § 220.205 (effective Aug. 22, 2013). The preamble also suggests that the exchange involved in solicitation or distribution may distract the pedestrian in addition to the driver and can interfere with "the safe and efficient flow of traffic within the Roadways."

Mr. Brammeier testified that, in researching his report, even after decades of work as a traffic engineer, he was still shocked by the number of pedestrian injuries and fatalities that occur at intersections nationally, most of which are caused by driver distraction. According to his report, some of the major "human factors" that contribute to traffic accidents are: alcohol, vision, reaction time/emotions, attention/decision making, experience, faulty

equipment/vehicles, telephone conversations, radio/conversing with a passenger, elderly drivers, road rage, and billboard/advertising. [Doc. 25–3 p. 16.] The report repeatedly returns to the threat of driver distraction: "While this consultant believes that these efforts [to make vehicle impact safer for pedestrians] are desirable, the focus must still remain on the DISTRACTED DRIVER." [Doc. 25–3 p. 18.] Mr. Brammeier further testified that reversing vehicles pose a major threat to pedestrians, justifying a ban on solicitation and distribution in parking lanes.

The City also referenced two incidents involving pedestrians. According to Mr. Camp, a crossing guard was struck in 2001. In addition, at the hearing, Mr. Ancona was asked about an incident that occurred while Plaintiffs were leafleting in Park Hills, Missouri. The City believed a KKK member had been struck by a car door while distributing literature in the street. Mr. Ancona testified that he believed the member had merely tripped.

The City's interest in pedestrian and traffic safety, as supported by the above evidence, is certainly stronger than the interest in crowd control asserted in *Johnson*, 729 F.3d at 1099–1100. While crowd control bears on public safety insofar as crowds can prevent security and emergency vehicles from getting through, the City presents a much more direct interest in public safety. The City also engaged an expert to assess safety risks whereas the government in *Johnson* relied almost entirely on assertions by the fair's executive director. *See Johnson*, 729 F.3d at 1099–1100. In *St. Louis County*, the Eighth Circuit commented that "[t]he government need not wait for accidents to justify safety regulations." 930 F.2d at 596. Nevertheless, the City must do more than recite a significant governmental interest, even if it invokes public health and safety concerns of the highest order and is supported by

expert testimony. The City must show that the challenged regulation is narrowly tailored to achieve that interest.

### ii. Narrow Tailoring

The City argues that *Johnson* is factually distinguishable because (1) it involved distribution at a public fair as opposed to in roadways; (2) there was less evidence of a nexus between the regulation and the governmental interest; (3) the government had shown disfavor toward the plaintiff's message; and (4) the regulation did not ban solicitation or other expressive activities known to occur. The City also cites as persuasive authority *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), which upheld a ban on distribution at a public fair and was cited with approval in *Johnson*. Contrary to the City's contentions, the Court is compelled by *Johnson* and Supreme Court precedent to conclude that the Ordinance, as it applies to distribution, is not narrowly tailored to achieve the City's significant governmental interest in pedestrian and traffic safety.

*Johnson* is sufficiently analogous to serve as a template in determining whether the Distribution Provisions of the Ordinance are narrowly tailored. While the government's interest grows when regulation jumps from a public fair to the roadways, that does not absolve the City of its burden to show the Distribution Provisions are narrowly tailored. *Johnson* is instructive insofar as it analyzes an assumedly content neutral ban on distribution that silenced an unpopular speaker in a traditional public forum. The only contemporary case to examine such a ban in the context of roadways came out of the Sixth Circuit and inexplicably approved a staggering prohibition on pedestrian activity despite Supreme Court precedent protecting distribution. *See Ater v. Armstrong,*

961 F.2d 1224 (6th Cir.1992); *Schneider v. Town of Irvington,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Jamison v. Texas,* 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943).

Just as the City may not rely on the strength of its interest to prove narrow tailoring, it may not rely on the mere fact of consultation with an expert. The City contends that Mr. Brammeier provided the evidence of a nexus that was lacking in *Johnson:* "As was held in the *St. Louis County* decision, testimony of an expert . . . is sufficient in and of itself in justifying passage of a restriction on expressive activity." [Doc. 40 p. 8]. While that may be true in the context of solicitation, courts, including the Eighth Circuit in *Johnson,* have consistently found that solicitation is more dangerous or disruptive than distribution. *See, e.g., Johnson,* 729 F.3d at 1101–02 (citing *Int'l Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992)). In the context of distribution, Mr. Brammeier's report and testimony must actually support a proper nexus between the City's ban on distribution and pedestrian and traffic safety.

The City also argues that the Eighth Circuit relied in part on the fact that the government had expressed disfavor toward the plaintiff's message in *Johnson.* However, it was the ban's underinclusiveness, not the government's expressions of disfavor, that caused the court to question the government's stated interest. *Johnson,* 729 F.3d at 1100–02. The City further contends that the Ordinance bans the only two forms of expression officials have actually witnessed and deemed dangerous whereas the evidence in *Johnson* showed that the government prohibited distribution but allowed other equally disruptive expressive activities like solicitation. While the Ordinance here bans both distribution and solicitation, the Court sees no reason why only "expressive" activities should be considered in evaluating its underinclusiveness. Indeed, to the extent more harmful non-expressive activities could be regulated without running the risk of infringing on constitutional rights, the City's failure to regulate those activities makes an even stronger case that the Ordinance is underinclusive.

Lastly, in *Johnson,* the Eighth Circuit implicitly distinguished *Heffron.* The court cited *Heffron* as involving a limited public forum where attendees paid for admission, unlike the public sidewalks at issue in *Saieg v. City of Dearborn,* 641 F.3d 727 (6th Cir.2011), or the free public fair before the court. *Johnson,* 729 F.3d at 1099–1100. The dissent's reliance on *Heffron* to refute the majority's analysis only provides further evidence that *Johnson,* and not *Heffron,* should guide the outcome in a case such as this one which involves public streets, a traditional public forum.

Turning to the Ordinance at issue in this case, § 220.205 provides: "No person shall stand in or enter upon a Roadway for the purpose of distributing anything to the occupant of any vehicle." A "Roadway" is defined as "[t]he portion of a public street, road, or highway improved, designed or ordinarily used for vehicular travel and extending from one (1) curb or edge of pavement to the opposite curb or edge of pavement, including lanes commonly used for parking and including center medians and lane dividers." Distribution to "an occupant of a nonmoving vehicle on the Roadway adjacent to the sidewalk" is permissible "if the person doing so is on the adjacent sidewalk." The Ordinance does not prohibit distribution "by any person on a sidewalk, to another person on the sidewalk, or by and among persons in a city parking lot or city park."

■ The City has not shown that this total ban on in-roadway distribution

sufficiently promotes pedestrian and traffic safety so as to satisfy narrow tailoring. "This narrow tailoring requirement means not only that the regulation must promote a substantial government interest that would be achieved less effectively absent the regulation, but also that the factual situation demonstrates a real need for the government to protect its interests." *Johnson*, 729 F.3d at 1099 (citations and internal quotations omitted). "[I]t is not enough for the [government] to recite an interest that is significant in the abstract; there must be a genuine nexus between the regulation and the interest it seeks to serve." *Id.* at 1099. In *Johnson*, the Eighth Circuit found the government had presented insufficient evidence that distribution of literature at the Twin Cities Pride Festival actually causes congestion. *Id.* at 1099–1100. The government cited general statements to that effect by the Executive Director of the Festival, but the only "specific evidence" was an incident where animal rights activists had handed out gory pictures, causing those with booths at the Festival to complain. *Id.* Here, the City likewise presented insufficient evidence that distribution actually causes accidents. Despite acknowledging the availability of accident reports which would show which intersections in Desloge are most dangerous and at what times, Mr. Brammeier did not consult any. Moreover, Mr. Brammeier repeatedly emphasized that he could find no research to support the risks of in-roadway distribution. While the City might argue this is a pressing, new area of concern requiring more study, equally if not more likely is the notion that the lack of research reflects a lack of risk.

In addition, the Ordinance is not narrowly tailored because it is underinclusive. "Where a regulation restricts a medium of speech in the name of a particular interest but leaves unfettered other modes of expression that implicate the same interest, the regulation's underinclusiveness may diminish the credibility of the government's rationale for restricting speech in the first place. In other words, underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Johnson*, 729 F.3d at 1100. In *Johnson*, the Eighth Circuit found the near-total ban on distribution at the Festival was underinclusive because performers were dealt with on an informal basis even though their entire purpose is to draw a crowd and Festival organizers were allowed to solicit donations, which is more disruptive than distribution. *Id.* Here, while the City bans distribution *and* solicitation for certain purposes, it does not ban a host of other in-roadway activities which would seemingly pose an equal or greater risk to the public. For one, Mr. Brammeier acknowledged the immense threat posed by texting while driving and the significant body of research to support it but the City does not ban texting while driving. In addition, the City does not ban pedestrians from walking on the street where there is no sidewalk, it does not ban skateboarders or rollerbladers from entering the street, and it does not ban entering the street to distribute something to the occupant of a bike. The City bans distribution in parking lanes but not in parking lots even though the main safety rationale for doing so is the threat of reversing vehicles. Under the Ordinance, a pedestrian is allowed to step into a parking lane to place a flyer on a non-moving vehicle but not to hand it to the occupant.

The Ordinance is also overinclusive, burdening substantially more speech than is necessary to further its interest in pedestrian and traffic safety. While the City does not ban in-roadway activities that pose an equal or greater risk to public safety, it bans forms of distribution that

pose little or no risk to public safety. The Ordinance is not limited to problematic intersections or times of day, which could be easily discerned from accident reports. *See City of Desloge*, 914 F.Supp.2d at 1051 (granting a preliminary injunction based in part on concerns that the 1999 Ordinance was not "tailored to particular times, problematic locations, or circumstances under which the City might have legitimate concerns about traffic safety and congestion"). It covers all manner of distribution, including someone who flags down her neighbor in the middle the day and steps out onto their sleepy residential road to hand her a pamphlet. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir.2011) (solicitation ban was overinclusive and not narrowly tailored because prohibited speech such as "a motorist who stops on a residential street, to inquire whether a neighbor's teen-age daughter or son would be interested in performing yard work or babysitting" posed no harm to traffic flow and safety) (internal quotations omitted). In addition, if a concern for the safety of children soliciting for their sports teams motivated regulation in the first place, the City could have banned solicitation and distribution by those under 18 years of age.

The City cites *ACORN v. St. Louis County* to essentially argue that this under and overinclusiveness is permissible because its choice of regulation is entitled to deference. In *St. Louis County*, the Eighth Circuit upheld a ban on solicitation in roadways. 930 F.2d 591. The Eighth Circuit noted that the government need not adopt the least restrictive or intrusive means and, once it has shown "a real need for the government to act to protect its interest," "the government's choice among the means to accomplish its end is entitled to deference." 930 F.2d at 595. Firstly, it is unclear whether the City's interest in pedestrian and traffic safety is sufficiently

threatened by in-roadway distribution to constitute a real need. *See id.* (noting there was no real need where governmental interest was not "sufficiently threatened" by banned activity in *United States v. Grace*). Even if the City has shown a real need, courts have consistently distinguished solicitation from distribution, upholding bans on in-roadway solicitation while striking down similar bans on distribution. Compare *St. Louis County*, 930 F.2d 591 (upholding ban on solicitation in roadways), *Int'l Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494 (5th Cir.1989) (same), *ACORN v. City of Phoenix*, 798 F.2d 1260 (9th Cir.1986) (same), *overruled in part by Redondo Beach*, 657 F.3d 936, with *Schneider v. Town of Irvington*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (striking down ban on distribution in roadways), *Jamison v. Texas*, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943) (same), *City of Desloge*, 914 F.Supp.2d 1041 (preliminarily enjoining ban on distribution in roadways); *but see Ater*, 961 F.2d 1224 (upholding ban on distribution in roadways and suggesting the government's "legitimate interest in safety would support the prohibition of all pedestrian activities on its roadways"). While the Court views with some skepticism the notion that solicitation in roadways truly poses a greater risk to public safety than distribution, precedent has spoken. The City's total ban on distribution in roadways cannot be justified.

Having found that Plaintiffs are likely to prevail on their First Amendment free speech claim, the Court finds that the other *Dataphase* factors are met. The Court holds that Plaintiffs are entitled to a preliminary injunction of the Distribution Provisions of § 220.205. As a result, the Court need not address Plaintiffs' claim under the due process clause of the Fourteenth Amendment.

### C. Injunction Bond

 "The Court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to be wrongfully enjoined or restrained." Fed. R.Civ.P. 65(c). The Court is afforded wide discretion in setting the amount of the bond. *Hill v. Xyquad, Inc.,* 939 F.2d 627, 632 (8th Cir.1991). But the bond amount must be adequate and not determined by some improper purpose. *Id.* Further, the Court must make necessary findings in support of its determinations. *Id.* Neither of the parties in this litigation has addressed whether an injunction bond should be issued. Because neither party will suffer monetary hardship by the issuance of the preliminary injunction and because the matter involves a constitutional violation, the Court will require a nominal bond in the amount of $100.

### IV. Conclusion

For the foregoing reasons, the Court finds that Plaintiffs have established the necessary requirements for the issuance of a preliminary injunction enjoining Defendants from enforcing the Distribution Provisions of the Ordinance pending the resolution of Plaintiffs' First Amendment action.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction is **GRANTED.** [Doc. 5.]

**IT IS FURTHER ORDERED** that the City of Desloge, Missouri is preliminarily enjoined from enforcing the Distribution Provisions of § 220.205 as enacted by Ordinance 2013.09 during the pendency of this action.

**IT IS FURTHER ORDERED** that Plaintiffs must provide a $100 bond as surety in accordance with the requirements of Federal Rule of Civil Procedure 65(c).